# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 24-0189V

|  |  |
|---|---|
| KRISTINE HARE,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: October 31, 2025 |

*Kathleen Margaret Loucks, Lommen Abdo Law Firm, Minneapolis, MN,* for Petitioner.

*Dima Jawad Atiya, U.S. Department of Justice, Washington, DC,* for Respondent.

**RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES**[1]

On February 7, 2024, Kristine Hare filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine she received on October 28, 2022. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

Because the parties could not informally resolve the issue of entitlement and damages, they were ordered to file briefs setting forth their respective arguments and

---

[1] Because this Ruling/Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling/Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

were notified that I would resolve this dispute via an expedited "Motions Day" hearing, which ultimately took place on October 24, 2025. As discussed below, I find Petitioner entitled to compensation, and award her **$33,000.00** for her actual pain and suffering plus $2,337.12 (undisputed) for unreimbursable medical expenses, for a total of $35,337.12.

## I.     Procedural History

On December 13, 2024, Respondent issued his Vaccine Rule 4(c) Report contesting entitlement in this case. ECF No. 29. The parties proceed to brief both the issues of entitlement and damages. On April 21, 2025, Petitioner filed her Motion for Ruling on the Record and Brief in Support of Damages ("Mot."), and Respondent filed a Response on June 4, 2025 ("Opp."). Petitioner filed a reply ("Reply") memorandum on June 16, 2025. ECF Nos. 37-41. I heard arguments from both parties during a Motions' Day Damages hearing held on October 24, 2025.

## II.    Relevant Medical History

A complete recitation of the facts can be found in the medical records, the Petition, declarations and affidavits, the parties' respective pre-hearing filings, and in Respondent's Rule 4(c) Report.

In summary, Ms. Hare was 64-years old when she received a flu vaccine in her left deltoid on October 28, 2022, at a CVS Pharmacy located in Andover, Minnesota. Ex. 1 at 5. Ms. Hare did not have a history of left shoulder pain. Ms. Hare noted in her affidavit,

> On October 28, 2022, I received the seasonal influenza vaccination at my local CVS pharmacy. I had received numerous vaccinations there in the past. On October 28, 2022, the pharmacy was unusually busy. I had to wait, even though I had scheduled an appointment in advance. When the individual administering the vaccine arrived for my appointment, she seemed hurried. She was different from the usual provider I had on past vaccinations at CVS. She stood to administer the vaccination as I was seated. I knew immediately as she started to administer the vaccine in my left arm that something was not right and told her so. There was an initial sharp pain that caused me to quickly react. She explained that "it was cold" because she had "just taken it out of the fridge," and that was the reason I had the painful sensation (as the vaccine was going into my arm). She continued on with the vaccine administration, which continued to be painful. I could feel a 'bubbly' sensation as the vaccination was administered. In all the years I have had vaccinations, I had never had this experience. In any

> event, I trusted she knew what she was doing because of her medical training and accepted her explanation.
>
> In the past, the soreness in my arm from vaccinations never lasted more than a few days, if even that long. After this vaccination, however, my arm continued to be sore and never got better. The pain and stiffness persisted immediately after the shot and, as months went on, I continued to have issues with pain. Within the first month after the flu shot, I started to notice my range of motion becoming increasingly impacted. It was getting difficult to perform everyday tasks like lifting my arm to put in sleeves as I dressed, reaching up high to get items off a shelf, and reaching behind me to pick items up. These motions became extremely restricted and caused great pain in my upper arm/shoulder. Throughout this time, I was taking ibuprofen periodically as I continued with my weekly visits to the YMCA, hoping that would help work out the pain and range of motion, but, unfortunately, the pain persisted and worsened.

Ex. 3 at 1-2.

On December 8, 2022, 41 days after vaccination, Ms. Hare had a telehealth visit with her primary care provider ("PCP") for a possible bladder infection. Ex. 4 at 342–43. At that time, she did not mention any left shoulder pain.

On January 30, 2023 – now 95 days after vaccination - Ms. Hare made a diabetes medication refill request through her online health portal. Ex. 4 at 345. She made two more requests for refills of her diabetes medications through the same online portal on February 20, 2023, and February 26, 2023. *Id*. at 353, 362–66. Regarding her lack of complaint about her shoulder regarding these visits, Ms. Hare stated, "Respondent contends that I should have reported my shoulder pain during my telehealth medical visit for a bladder infection on December 8, 2022. As indicated in my medical records, this was an online telehealth visit for symptoms unrelated in any way to my shoulder…There would be no reason why I would discuss my shoulder pain at a telehealth visit for a bladder infection." Ex. 7 at 1.

On March 20, 2023 (now four months and 21 days after vaccination), Ms. Hare saw her PCP, Jacqueline Olczak, M.D., for an in-person appointment for a diabetes recheck and health maintenance update. Ex. 4 at 376– 78. At that visit, Ms. Hare reported "persistent pain" in her left shoulder "at [the] location of her flu shot injection" and "wonder[ed] if she has SIRVA" (*id*. at 377), after she had "research[ed] conditions related to vaccination and discover[ed]" SIRVA. Ex. 3 at 3. Dr. Olczak noted that Petitioner had

"fairly good" range of motion ("ROM"), and recommended Ms. Hare undergo home physical therapy. Ex. 4 at 377.

Two months later, on May 22, 2023, Ms. Hare messaged her PCP and complained that her left shoulder was "still sore" and reported that her pain and limited range of motion had increased since her last visit and had "impact[ed] [her] day to day routines and night time sleep." Ex. 4 at 421, 423. Dr. Olczak recommended an MRI of Petitioner's left shoulder. *Id*. Ms. Hare stated that she would like to proceed with an MRI once she investigated the cost. *Id*. at 422–23.

On June 9, 2023, Ms. Hare saw orthopedic specialist Emily Nelson, N.P., for her left shoulder pain. Ex. 4 at 433–34. She reported her pain "initially started in her left biceps area shortly after [vaccination]." *Id*. at 433. Petitioner stated that over the prior three months, her pain had "radiated up to her shoulder and has[d] been much more severe." *Id*. Petitioner reported pain with overhead movement and stated that she could not completely lift her arm over her head. *Id*. at 434. On examination, Ms. Hare had decreased ROM and pain with palpation on the acromioclavicular joint. *Id*. NP Nelson assessed "SIRVA" and suspected a possible rotator cuff injury or tear. *Id*. NP Nelson prescribed Prednisone and Tizanidine and recommended that Petitioner undergo an MRI of her left shoulder. *Id*.

On June 9, 2023, Ms. Hare underwent an MRI of her left shoulder that showed severe adhesive glenohumeral capsulitis, mild degenerative changes of the glenohumeral joint with a degenerative tear of the superior labrum, a normal rotator cuff, and a normal deltoid muscle. Ex. 4 at 445.

On June 23, 2023, Ms. Hare was seen by orthopedic surgeon Gregory Folsom, M.D., for her left shoulder pain. Ex. 4 at 473. She reported numbness, tingling, weakness and pain since vaccination. *Id*. On examination, Petitioner had a reduced range of motion, with forward flexion to 120 degrees and abduction to 90 degrees. *Id*. at 474. Dr. Folsom's impressions included SIRVA, subacromial impingement, and adhesive capsulitis of the left shoulder. *Id*. at 476. Specifically, Dr. Folsom stated that "[t]he patient's history, imaging and exam are consistent with shoulder injury related to vaccine administration. There is perhaps an overlay of mild adhesive capsulitis." *Id*. Petitioner received a steroid injection in her subacromial space, and Dr. Folsom referred her to physical therapy ("PT"). *Id*. at 476-77.

On July 18, 2023, Ms. Hare attended an initial evaluation for physical therapy of her left shoulder pain. Ex. 4 at 493. The record from this visit notes, "Patient reports immediate onset of L shoulder pain following flu vaccination 10/28/2022… Patient reports

4

some improvement since a subacromial injection on 6/23/2023." *Id*. However, Ms. Hare reported that she still experienced pain while performing activities of daily living. *Id*.

Between August 4 and December 14, 2023, Ms. Hare attended seven PT sessions. Ex. 4 at 519, 534, 544, 556, 597; Ex. 5 at 15–19, 56. At a PT appointment on August 23, 2023, Ms. Hare reported that she was able to bike and kayak on her vacation, and she was able to roll par way onto her left shoulder (although not for long). Ex. 4 at 534. She continued to show deficits with her range of motion during this visit. *Id*.

On September 15, 2023, Ms. Hare returned to Dr. Folsom, reporting some improvement with the steroid injection, but she still had some weakness and stiffness in her left shoulder, in addition to pain along the lateral and posterior aspects of the shoulder. Ex. 4 at 571. Dr. Folsom opined "symptoms consistent with SIRVA/impingement syndrome of adhesive capsulitis and majority of her symptoms today suggestive of adhesive capsulitis." *Id*. at 573. Dr. Folsom noted that the steroid injection likely reduced inflammation in her shoulder, although the adhesive capsulitis had not fully resolved. *Id*. Dr. Folsom recommended continuing physical therapy and a home exercise program. *Id*.

Ms. Hare had her final PT session on December 14, 2023. Ex. 5 at 56. She continued to report pain when doing planks and other shoulder intensive exercises. *Id*. Petitioner's left shoulder flexion and abduction was within normal limits although she continued to demonstrate some range of motion deficits as compared with her right shoulder. *Id*. Her physical therapist noted that Petitioner "received education on home exercise program and is aware of need to continue with program on her own. She is going to attempt independent management through her home exercise program." *Id*.

On January 16, 2024, Ms. Hare presented to her PCP for a Medicare wellness visit. Ex. 5 at 6–9. Her medical history included "left shoulder pain due to vaccination injury, seeing PT." *Id*. at 7. She was not treated for her shoulder at this visit and no additional records have been filed.

### III.   Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

5

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological

---

[3] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### IV.  Ruling on Entitlement and Damages

After listening to the arguments of both sides, I issued an oral ruling on both entitlement and damages constituting my findings of fact and conclusions of law, pursuant to Section 12(d)(3)(A), at the conclusion of the October 24, 2025 hearing. An official recording of the proceeding was taken by a court reporter, although a transcript has not yet been filed in this matter. I hereby fully adopt and incorporate that oral ruling as officially recorded.

### A. Entitlement

Respondent has contested entitlement, arguing that there is not preponderant evidence to show that Petitioner experienced shoulder pain within 48 hours of vaccine administration. Opp. at 5-7. Petitioner did not report shoulder pain until more than four and a half months after vaccination, and when she did report her pain, she did not identify it as beginning within the two-day post-vaccination period. *Id*. at 6. Respondent further contends that more than seven months after vaccination, Petitioner described that onset occurred "shortly after vaccination." *Id*. Respondent states that this delay is especially significant here, where Petitioner had an interim checkup with her PCP 41 days after vaccination, as well as three additional communications with her PCP in the interim and did not mention any shoulder pain. *Id*.

I do not find these arguments to be persuasive. First, Petitioner was newly retired at the time of vaccination. Ex. 3 at 3 (sworn and notarized affidavit). She explains in her affidavit that she resisted seeking medical advice during this time due to financial hardship concerns. *Id*. She also explained that after she retired, she had chosen a high-deductible insurance plan prior to Medicare eligibility. *Id*. Petitioner had hoped that with continued oral over-the-counter pain medications and gentle physical activity, her shoulder pain would subside without the need for costly medical intervention. *Id*. She was concerned that her shoulder pain would necessitate costly "specialist visits, imaging, and therapy." *Id*. It was only when her symptoms had worsened to the point that her activities of daily living were severely impacted that she sought medical attention. *Id*.

Second, there is the matter of Petitioner's financial concerns, which are also reflected in the medical records. During Petitioner's first visit with her PCP to discuss her shoulder pain, her physician noted that Petitioner "[h]as high-deductible insurance … If ongoing issues can consider MRI down road." Ex. 4 at 377; *see also* Ex. 4 at 433 ("[s]he does voice some concern over the price of the MRI after insurance currently has high deductible. She will be switching over to Medicare this fall and would like to save any high-cost testing until then if possible"). These kinds of concerns explain in part a reluctance to treat the issue.

In addition, when Petitioner was seen for her shoulder symptoms on March 20, 2023, she may not have specifically state that her shoulder pain began at the time of vaccination, but she did report that she had "persistent pain in left shoulder/deltoid area at location of her flu shots." Ex. 4 at 377. And she thereafter linked her symptoms to the vaccination. A May 22, 2023 telephone encounter note from her PCP's office states, for example, that "[p]atient received flu shot in 10/2022. Patient states arm is still sore and affecting ADL (activities of daily living) function." Ex. 4 at 421. On June 9, 2023, Petitioner reported to the nurse examining her shoulder that she "thinks the [left shoulder] pain started after getting a vaccination in October 2022." *Id*. at 433. During an initial consultation on June 12, 2023, with Dr. Gregory Folsom, an orthopedic surgeon, Petitioner reported "that her current symptoms began October 2022 with a mechanism of injury/trauma. She states she got the flu vaccine and has had ongoing pain since that point." *Id*. at 473; *see also* Ex. 4 at 493 (initial PT evaluation, "[p]atient reports immediate onset of L shoulder pain following flu vaccination 10/28/2022.")

These statements in the medical records, coupled with the Petitioner's financial concerns regarding her high-deductible insurance plan (which credibly explain the treatment gaps), provide context for delay in seeking treatment, and do not prevent a finding that Petitioner has met the 48-hour onset requirement.

8

Even if a petitioner has satisfied the requirements of a Table injury or established causation-in-fact, he or she must also provide preponderant evidence of the additional requirements of Section 11(c), *i.e.*, receipt of a covered vaccine, residual effects of injury lasting six months, etc. *See generally* § 11(c)(1)(A)(B)(D)(E). But those elements are established or undisputed. Thus, based upon all of the above, Petitioner has established that she suffered a Table SIRVA, satisfying all other requirements for compensation.

**B. Damages**

   **a. Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include an award "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

A special master may also look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d

958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

### b. Appropriate Compensation in this SIRVA Case

#### i. Awareness of Suffering

Neither party disputes that that Ms. Hare had full awareness of her suffering, and I find that fact is supported by the record evidence.

#### ii. Severity and Duration of Pain and Suffering

As I noted during the hearing, Ms. Hare's case is a SIRVA injury that did not require surgical intervention. Thus, we are below a six-figure award for Ms. Hare's pain and suffering, absent extraordinary circumstances. The amount awarded in the one case cited by Petitioner, *Marino v. Sec'y of Health and Human Servs.,* No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018), is too high, as that petitioner had a more severe injury and more treatment. For example, the *Marino* petitioner's injury was so severe, that she never played tennis again. *Id*. at *8. Ms. Marino's injury also affected her ability to work as a nurse practitioner and she was still reporting pain levels at 8-9/10 almost three years post vacation. *Id*. In addition, the *Marino* case was issued in 2018 before the Motion's Day procedure was instituted approximately five years ago. Since then, hundreds of SIRVA decisions have been issued to hopefully assist the parties with their informal settlement discussions. The SIRVA cases issued prior to the Motion's Day process being initiated reflect more of an *ad hoc* analysis that is not in line with more recent decisions. Thus, the $75,000.00 awarded to the Petitioner in *Marino* is too high an award to be considered for Ms. Hare.

By contrast, the two cases cited by Respondent, *Hiatt v. Sec'y of Health and Human Servs*, No. 23-1560V, slip op. (Fed. Cl. Spec. Mstr. May 13, 2025), and *Turnquest v. Sec'y of Health and Human Services*, No. 21-0065V, 2024 WL 3665961, at *6 (Fed. Cl. Spec. Mstr. July 2, 2024) appear to be good comparable cases. In *Hiatt*, the petitioner similarly delayed reporting her injury for more than four months. During that time, the *Hiatt* petitioner also had two interim medical appointments with her PCP and did not report shoulder pain. *Id*. at 3. And similarly to Ms. Hare, the *Hiatt* petitioner was referred to an orthopedist, completed eight sessions of physical therapy, and received one steroid injection to her shoulder. *Id*. at 3-4. Ms. Hiatt was awarded $25,000.00 in pain and suffering. Because Ms. Hare's case is a case involving very conservative treatment, i.e.,

an eight-month treatment course, one steroid injections, and only eight physical therapy sessions and medication, I do find that the *Hiatt* case is a very good comparable case. Similarly, in *Turquest*, the petitioner delayed reporting for several months, he had an x-ray and MRI, and surgery was recommended and scheduled (although Petitioner did not end up undergoing surgery). The *Turnquest* petitioner was awarded $30,000.00, for his pain and suffering.

Based on all the circumstances and evidence submitted, and in the interest of rough justice, I find that her past pain and suffering warrants an award of $33,000.00. While Petitioner's delay in treatment did not prevent an entitlement finding, it underscored the likelihood that this SIRVA was not especially severe.

### iii. Unreimbursable expenses

The parties have agreed that Petitioner has submitted preponderant evidence to support $2,337.12 in past out-of-pocket expenses related to her shoulder injury, and I shall award that amount. Opp. at 14; Reply at 6.

### Conclusion

Based on my consideration of the complete record as a whole and for the reasons discussed in my oral ruling, pursuant to Section 12(d)(3)(A), **I find that Petitioner is entitled to compensation and that $33,000.00, represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[4]

**Accordingly, I award Petitioner a lump sum payment of $35,337.12 (consisting of $33,000.00 for her actual pain and suffering plus $2,337.12, for unreimbursable medical expenses), to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner**. This amount represents compensation for all damages that would be available under Section 15(a).

---

[4] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

The Clerk of Court is directed to enter judgment in accordance with the Decision.[5]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[5] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.